## GOTTLIEB PRESCOTT

### *v.*

## CATHARINE GUYLER.

1. ALLEGATIONS AND PROOFS — *dates laid under a videlicit.* Where, in an action for a breach of promise of marriage, the terms of the promise — when it was to be fulfilled, and when the tender of marriage was made, and the refusal — are laid under a *videlicit,* the dates need not be proved as laid.

2. So, where it was shown, under such a state of pleading, that the defendant promised to marry the plaintiff in the following spring, after the former should return from a trip he contemplated, at which time he expected to have his house finished, it was *held,* although no day was fixed for the marriage, such proof would sustain a verdict for the plaintiff, under a count to marry on request, or within a

---

reasonable time, or generally, but would be more especially applicable to the count to marry in a reasonable time.

3. SAME — *under a count to marry on request.* In such an action, under a count to marry on request, positive proof of such request and refusal is never required. This may be inferred from circumstances, and especially from testimony showing a substantial refusal by the defendant.

4. SAME — *by whom a request to marry may be made.* Nor need such request be made by the plaintiff herself. It may be made by her father, or other friend, whose authority to do so may be inferred from the relations existing between the parties.

5. SAME — *what constitutes proof of an offer and refusal to marry.* During an interview between the father of the plaintiff, and in her presence, and the defendant, the father told the defendant if he did not want Catharine (the plaintiff), he should not have Julia, her sister. The defendant said but little. He said he liked Julia better than Catharine. From this, the jury might well infer an offer and refusal.

6. EVIDENCE — *effect of subsequent expressions of plaintiff.* In this case, it appeared the plaintiff made use of strong, and even indelicate language respecting the defendant, and an avowal that she would not marry him now. It was *held,* that if these expressions were made after the defendant had refused to marry her, they ought not to prejudice her rights in the case.

7. While she was discarded by him, the defendant had no right to question the sentiments she entertained towards him. After that, if he wished to place himself in a position to say that she would not fulfill her engagement with him, when he had broken his with her, he should have renewed his offer to marry her. If she had then refused, he might have said she had not always been ready and willing to marry him.

8. But the court do not wish to be understood as saying, that even this would have defeated a right of action once complete. Of this they express no opinion.

9. BREACH OF PROMISE OF MARRIAGE — *of the character of promise required.* It is not essential to the maintenance of an action of this kind, that the promise of marriage was made *bona fide* upon both sides; the defendant is as much liable upon a promise made *mala fide,* as upon one made *bona fide* by him.

APPEAL from the Superior Court of Chicago. This was an action of assumpsit instituted in the court below, by Catharine Guyler against Gottlieb Prescott, to recover damages for an alleged breach of promise of marriage.

The declaration contained three counts; the first as follows:

For that whereas, heretofore, to wit, on the first day of August, A. D. 1861, at &c., in consideration that the plaintiff

being then and there sole and unmarried, at the special instance and request of the defendant, had then and there undertaken, and faithfully promised the defendant to marry him, the defendant, when she, the plaintiff, should be thereunto requested, he, the defendant, undertook and then and there faithfully promised to marry the plaintiff when the defendant should be thereunto afterwards requested.

And the plaintiff avers that she, confiding in the said promise and undertaking of the defendant, hath always, from thence hitherto, remained and continued, and still is, sole and unmarried, and hath been for and during all the time aforesaid and still is ready and willing to marry him, the defendant, to wit, at, &c., whereof the defendant hath always there had notice.

And although the plaintiff, after the making of the said promise and undertaking of the said defendant, to wit, on the day and year aforesaid, at the place aforesaid, requested the defendant to marry the plaintiff, yet the defendant, not regarding his said promise and undertaking, but contriving, &c., did not nor would, at the said time when he was so requested as aforesaid, or at any time before or afterwards, marry the plaintiff, but hath hitherto wholly neglected and refused, and still doth neglect and refuse so to do, to wit, at, &c.

The second count is the same, except that on the 1st day of July, 1861, in consideration, &c., the defendant promised to marry the plaintiff in a reasonable time thereafter; that after such reasonable time had elapsed, to wit, on the 1st day of July, 1862, the plaintiff requested the defendant to marry her, and he refused.

The third count the same, except that on the 1st day of May, 1862, in consideration that the plaintiff, at the request of the defendant, had promised to marry him, the defendant promised to marry the plaintiff.

And although a reasonable time had elapsed since the making of this last mentioned promise, and although the plaintiff afterwards, to wit, on or about the first day of July, 1862, at, &c., requested the defendant to marry her, he refused, to her damage of five thousand dollars.

The defendant pleaded the general issue, a jury was duly impanneled, and the cause came on for trial.

*Daniel Heartt* testified on behalf of the plaintiff, as follows: I know the plaintiff and defendant; have known the plaintiff for eight or ten years — have known her from a child. She has lived with me, off and on, for three or four years. She lived with me in 1853 or 1854 — after that she went to school from my house. Since 1859, she has been with me the biggest part of the time. Saw the defendant in the country, and not after, until about two years ago at my house. He came there, I took it, a sparking. They sat up after the family had gone to bed. Defendant was there six, seven or eight times — it might have been more. There was a good deal of talk about marriage. Defendant was going trapping in the spring, and when he came back, his house would be finished, and he was going to be married. This was in January or February, 1862. I offered to make a wedding for them at my house, but he preferred going some place else; he said he did not want to be married there. When I talked about putting off the marriage, he said he did not want to wait longer than till he came back, when his house would be finished. Defendant did not stay over night at my house; he would call in the evening and stay late. Have heard the thing talked over several times — almost every time he came. Defendant took the plaintiff home in February last (1862). These conversations were last winter, running back to st summer.

*Upon cross-examination:* Defendant was there at least six times. I left him there at night when I went to bed, and did not find him there in the morning. Sometimes they talked together in German. I do not understand German. Sometimes they talked in English — can't say how often. They generally sat in the room with myself and wife till we went to bed. My wife sits up, on the average, till nine o'clock. Once or twice they were in the other room. I can't give the exact words used, except that when he came home in the spring, the house would be finished, and then they would be married. This was in

February, 1862, just before he took the plaintiff away from my house. Think my wife asked him when he was going to be married—he said he was going a trapping, and when he got back in the spring, his house would be finished, and then he would be married.

*Upon re-examination by plaintiff:* I knew of her having cotton cloth for sheets and pillow-cases—she had a bolt of cotton cloth, and pieced some bed-quilts. They both talked about his return in the spring, and she assented to marrying him.

Several other witnesses were introduced by the plaintiff, whose testimony was corroborative of that of the first witness examined. It was proven by one, the brother of plaintiff, that defendant requested plaintiff to select a stove for him to take out to his house to heat it up while it was being plastered, which she did. Sometimes, in the absence of the plaintiff from home, the defendant waited upon her sister Julia.

In May or June preceding the trial, the defendant told one of the witnesses that he liked Julia better than Catharine, and the same witness was present upon an occasion when the defendant asked the plaintiff's father if he would help him plant corn—the old man said if he did not want Catherine, he should not have Julia. Defendant did not say much—he said he liked Julia better than Catherine. The same day the defendant left old man Guyler's house, where he had been boarding for some time, and went to a neighbor's to board, saying he was sorry he had to leave Guyler's.

From time to time, in his absence on his trapping expeditions, the defendant wrote to the plaintiff. The following letters were given in evidence :

LAKE CROSS, March 13th, 1860

MY DEAR BELOVED CATHRANE GUYLER—I write a few lines to you. I am now a great was from you, but my heart is all was wet you, Day and night. I think of you, and I shal never far git you, is long is I live until I lay my head in the grave. My Dear C we ar not duing vere well be cous the ice is not out of the river. I am now at Lake Cross on the Mis-

sippi River, bout we are soun going a wa from her abot two hundred miles up the River onto the Chipewa River, that is all that I can write to you, you mus excuse my bad writing for my pen and ink is bad and the write sill wors

I shall all was reman your friend

G PRESCOTT.

I shall write mor the nex time. I send my best Respects to you and to your folks. far git me not.

REEDS LANDING April 6th 1860

MY DEARS CATHRANE,

I take the pen in my hand to write a few lines to you. I have wrote one letter all rade from Lake Cross to you bud I have received Know answer, thar for I write a gain as good as I kan We ar trapen now on the mouth of the Chipewa River bud I think that we will son leave and go up to St Paul and we will sall our fur thar, and den I shal kom back again, if it is the Lords will, and we shall see each other again for you ar the onle one that my heart desires.

I mus close my letter for I have no time to write. I send my best respect to you and to your parents. I shall all was remember you, if I have mad anne mis takes you mus excuse me, for I wrote thes letter in greate haste, and I cant write well                                   G PRESCOTT.

Reeds Landing Waubasha County, Minnesota.

I pray for a answer.

WINONA Octb 10th 1860

MY DEAR CATHARINE,

I write a few lines to you to lat you know that I am well and my health is good thel, this Day and I hope that the Lord will spaer your health for ever. My Dear be loved Catharine I dont know wath to write to you we have been up on the Mississippi River as fawr as Reeds Landing, but we have not ben vere loke, thel now my Dear I mus close my letter, please and excuse me for not writing more. I wrote thes letter in a hurry Dear Catharine. I Love you for ever and I shal love you ther I die and I am Desiring to hear from you a prompt answer.                                   G. PRESCOTT.

I send my best Respect to you and to your Folks, and I shal never for git you.

P. DU CHIEN, Novem. 1st 1860.

My DEARS CATHARINE,

I Received yowar letter from the 12 Oct. and I was vere glad to hear from you that you ar well, and that you still think of me.

My Dear we ar now at Prairie du Chien, and we ar going to send som of our Fur to Millwaukee, and from her we shall go down the Mississippi as far as Alton on the Illinois River if the Lord spares our health. My Dear I dont know ane thin vere Important to Write to you. We have catch a bot 18 Hundred Mus rats and 21 Mink and 6 Coons. Me Dear one I wish you would rite as sone as you kin. I shall be in Dunleith in 2 weeks. My Dear Catharine I wish that the Lord would spare yowar health for a great mane Year, and I wish that the Lord would bring ous to gider for ever.

My Dear Catharine Guyler I love you from all my heart. I wish that I could have your Hand and Heart for ever for my on. that is all my heart desires for, My Dear you mus excuse my bad writing for my pen and Ink is bad and the Write still worst.

I send my best Complimens to you and to your Folks.

I love you truly

GOTTLIEB PRESCOTT.

DUNLEITH, ILL.

On the part of the defendant, *Augusta Ham* testified: I heard Mrs. Guyler, plaintiff's mother, say, in the presence of the plaintiff, that the defendant should not have either of her daughters. The plaintiff told me, in June last, that if she had known the defendant as well last spring as she did now, she would have looked upon him as well with her backside as her face; and she also said that she would not marry him now. This was in June. A few days after this suit was brought, the plaintiff told me that if he had been going to marry another girl she would not have sued him, but as he wanted to marry her sister she had sued him for that.

*George Huxhold,* for the defendant, testified: Soon after this suit was commenced, I had a conversation with old Mrs. Guyler, in the presence of the plaintiff. The old lady said to me, what does Mr. Prescott say now? I replied that he had said nothing to me. She then said that Kate was too easy on him — she ought to have put him in the jail. I said as long as he was free, he could do as he was a mind to. The old lady replied: I have looked out for all that. His land is all clear now, and if he does sell it, the man who buys it can pay the damages that Kate gets. Mrs. Guyler then said that if Gottlieb had married a strange girl instead of Kate's sister, they would not have sued him, but they had sued him because he was going to marry her sister. She said she was not as mad at Prescott as she was at Julia.

*Julia Guyler* testified on behalf of the defendant: I have known the defendant about three years and a half. About two years and a half ago he came to live at our house. He worked in the house for his board. He was like one of the family — just like an own child. He was there all the while except when he went trapping every fall and spring. Plaintiff was hardly ever at home while defendant lived at our house; she was at home occasionally, and stayed two or three weeks at a time. We always called the defendant "Gott." I don't know of any reason why defendant wrote to my sister the first winter after he left the house. I have always been on intimate terms with my sister, and am now on good terms with her. We always went out together with defendant when my sister was at home. My sister and I used to talk about matters confidentially; she never told me that she and the defendant were engaged to be married.

I went to Heartt's while my sister was there, four or five times, if not more. I spent the night there twice with her. Prescott was along. When the defendant got the stove, father and mother sent him to Heartt's, and told him Kate would know more about a stove than he would. I don't know of any special reason why Catharine should be referred to about the stove.

I did not know of any trouble between Catharine and defendant until July last.

The testimony being closed, the court gave to the jury voluminous instructions on behalf of the plaintiff, which are not involved in the decision of the case.

The defendant asked the court to give to the jury certain instructions on his behalf, a portion of which were refused in the form as asked, but were qualified by the court, and given with the qualifications; others were refused altogether. Those which were given with modifications are as follows, the modifications being *italicised:*

1. If the jury shall believe from the evidence in the case, that a mutual promise of marriage was made between the plaintiff and defendant, and that in February, 1862, it was mutually promised between them that they should be married in the spring of the year 1862, when the defendant should come back from Minnesota, when his house would be finished, and that there was no other time for such marriage fixed between them, then, under the pleadings in this case, they must find for the defendant. *This is so — the rule is, that where a particular time is relied upon, it is not sufficient to prove it, and thus dispense with a request to marry, unless the plaintiff has alleged a particular time in the declaration.*

3. Although the jury should believe from the evidence in the case, that there was a mutual promise of marriage made between the plaintiff and defendant, they must, nevertheless, find for the defendant, under the pleadings in the case, unless they shall further believe from the evidence, that the plaintiff, after such mutual promise of marriage, and before the commencement of this suit, made an offer of marriage to the defendant, and that he refused such offer — *or they must be satisfied that what passed between the parties was equivalent to a request and refusal.*

4. If the jury shall believe from the evidence, that the defendant promised to marry the plaintiff in the spring of the year 1862, when his house would be finished, and that the plaintiff promised to marry him at such time; still, under

the pleadings in the case, the jury must find for the defendant, unless they shall believe from the evidence, that since the spring of the said year, and before the commencement of this suit, the plaintiff made an offer of marriage to the defendant, and that he refused such offer when so made by her — *or that what passed between the parties was equivalent to a request or refusal.*

8.  If the jury believe from the evidence, that the plaintiff, before the commencement of this suit, stated that she would not marry the defendant, and made use of other expressions with reference to him, offensive and gross in their character, the jury may take such statements into consideration in determining whether or not the plaintiff, before bringing the suit, offered to marry the defendant. *But if such expressions were made after defendant had refused to marry her (if he did refuse), they ought not to prejudice the plaintiff's rights, if any she has.*

The following are the instructions asked by the defendant, and refused by the court:

2.  Before the jury can find a verdict for the plaintiff in this case, they must be satisfied with the evidence in the case that there was a mutual promise of marriage made between the plaintiff and defendant, as alleged in the declaration; and they must further believe from the evidence, that at all times subsequently to such mutual promise, and up to the commencement of this suit, the plaintiff was ready and willing to marry the defendant, and that after such promise, and before the commencement of this suit, she offered to marry the defendant, and that he refused such offer when so made.

6.  The jury are instructed that the only count in the declaration which they are to regard in this case, under the evidence in the case, is the third count; and they are further instructed that under that count they must find for the defendant, unless they shall believe from the evidence, that the plaintiff, on the 1st day of July, 1862, made an offer of marriage to the defendant, and that he refused such offer when so made by her.

11. A promise to marry must be mutual, and it must be also the *bona fide* intention of both parties to consummate the same. If, therefore, the jury should believe from the evidence that there was a promise of marriage between the plaintiff and defendant, and that subsequently to such promise, and prior to the commencement of this suit, the plaintiff has stated that she would not marry the defendant, or has made use of any other expressions, from which the jury may infer that she did not intend in good faith to consummate such promise as aforesaid, by marriage, they must find for the defendant.

The jury returned a verdict for the plaintiff, and assessed her damages at eight hundred dollars. A motion for a new trial was denied, and a judgment entered upon the verdict, from which the defendant took this appeal.

He now insists that the court below erred: *First*, In refusing to give instructions asked by defendant, numbered 1, 3, 4 and 8, as asked, and in giving them with modifications. *Second*, In refusing altogether to give instructions 2, 6 and 11; and, *Third*, In overruling the defendant's motion for a new trial.

Messrs. CLARKSON & TREE, for the appellant.

Messrs. WILLIAMS, WOODBRIDGE & GRANT, for the appellee.

Mr. CHIEF JUSTICE CATON delivered the opinion of the Court:

In all the counts of the declaration, the terms of the promise of marriage, when it was to be fulfilled and when the tender of marriage was made, and the refusal, are laid under a *videlicit*, and hence, the dates need not be proved as laid. Many mutual promises are expressly proved by the testimony of Heartt, who was present on several occasions when the whole subject was talked over between them, and the testimony leaves no doubt that the original engagement had been made some time before. The letters written by the defendant to the plaintiff are of a character to strongly indicate the existence of a mutual engagement between the parties, and hence, are cor-

roborative of the testimony of Heartt. It is evident that no day for the marriage was ever fixed, but it was the expectation and intention of the parties that it should be consummated the following spring, after the defendant should return from the north, at which time he expected to have his house finished. This evidence would, then, sustain a verdict on either count of the declaration, but is more especially applicable to the count to marry in a reasonable time. A question is made, however, as to plaintiff's right to recover on the count on a promise to marry on request, that the evidence is insufficient to prove a request by the plaintiff and refusal by the defendant. Positive proof of such request and refusal is never required. This may be inferred from circumstances, and especially, from evidence showing a substantial refusal by the defendant. Nor need such request be made by the plaintiff herself. It may be made by her father, or other friend, whose authority to do so may be inferred from the relations existing between the parties. In this case, an interview took place between the father of the plaintiff, and in her presence, and the defendant, in which her father told the defendant if he did not want Catharine (the plaintiff), he should not have Julia. Defendant said but little. He said he liked Julia better than Catharine. From this, the jury might well infer an offer and refusal. Any female of the least sensibility would certainly consider this a sufficient refusal to marry her, to prevent her from renewing the offer, never so indirectly. In any civilized country she should have considered her offer to marry rejected, and herself discarded. Then we may well suppose that hate would begin to take the place of love. We think the evidence sustained the declaration and warranted the verdict.

The case is overloaded with instructions, most of which were given, certainly covering all the law with which it was necessary to enlighten the jury. Eight long ones asked by the defendant were qualified by explanatory words added by the judge, and three were refused altogether. These qualifications are all within the principles just stated, except that to the eighth instruction. There was proof showing that after

Prescott *v.* Guyler.

she had been rejected by the defendant, the plaintiff had used strong, if not indelicate language in reference to the defendant, and that she would not marry him now; and the court said that if these expressions were made after the defendant refused to marry her (if he did refuse), they ought not to prejudice the plaintiff's rights, if any she had. In this we agree with the court below. We must have some regard for human infirmities. A discarded girl, when badgered on the subject, can hardly be expected to speak with the caution and circumspection which her lawyer would advise. While she was discarded by him, he had no right to question the sentiments she entertained towards him. After that, if he wished to place himself in a position to say that she would not fulfill her engagement with him, when he had broken his with her, he should have renewed his offer to marry her. If she had then refused to marry him, he might have said that she had not always been ready and willing to marry him; but we will not be understood as saying that even this would have defeated a right of action once complete. Of this we express no opinion now. The two first instructions refused have been fully answered by what has been already said. The third and last is based upon the principle, that unless the promise of marriage was made *bona fide* on both sides, the plaintiff could not maintain an action upon it. This cannot be so. The defendant must be as much liable upon a promise made *mala fide*, as upon one made *bona fide* by him. The other principle embodied in the instruction has been already considered.

The judgment must be affirmed.

*Judgment affirmed.*

Mr. JUSTICE WALKER concurred.

Mr. JUSTICE BREESE dissented.